TCA BUILDING COMPANY

v.

NORTHWESTERN RESOURCES
CO., et al.

Civ. A. No. G–93–265.

United States District Court,
S.D. Texas,
Galveston Division.

Sept. 1, 1994.

John V. Singleton, Jr., G. Allen Price, Houston, TX, for TCA Bldg. Co.

David J. Beck, Ronald D. Secrest, Beck, Redden & Secrest, Houston, TX, Don Henry Magee, McGinnis, Lochridge & Kilgore, Austin, TX, for Northwestern Resources Co.

Robert K. Wise, David Preston Poole, Worsham, Forsythe, Sampels & Wooldridge, Dallas, TX, for Texas Utilities Elec. Co.

Lee L. Kaplan, Baker & Botts, Houston, TX, for Utility Fuels Inc. and Houston Lighting & Power Co.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

KENT, District Judge.

Plaintiff TCA Building Company ("TCA") brings this action against Defendants Northwestern Resources Company ("Northwestern"), Texas Utilities Electric Company ("TUE"), and Houston Lighting & Power Company ("HL & P"),[1] alleging that the Defendants conspired to keep it from mining lignite from its property, in violation of the Sherman Act, 15 U.S.C. §§ 1 & 2. This property, consisting of two contiguous tracts of land, is located within the area covered by the Jewett Mine, a near-surface lignite strip-mining operation run by Northwestern in Freestone and Leon Counties, Texas. Before the Court is the Defendant's consolidated motion for summary judgment or dismissal. For the reasons stated below, the motion is GRANTED IN PART and DENIED IN PART.

### Background

*The Jewett Mine*

In 1972, the tracts now owned by TCA were purchased by W. Laird Lahrmann and his father, W. Lee Lahrmann, from the Texas Veteran's Land Board ("VLB"), under contracts for deed. These tracts, constituting approximately 107 acres, hold an estimated 2.8 million tons of recoverable lignite. The elder Lahrmann assigned the tracts to his son in 1976. In 1978, the son leased his mineral interests in the tracts to Defendant TUE, for a ten-year primary term.[2] Since the VLB still held an interest in the property, at that time this was the longest primary term permitted by statute. Simultaneously, however, W. Laird also executed documents purporting to grant TUE the option to lease the tracts for an additional 35 years. W. Laird died shortly thereafter, and his interest in the tracts passed back to his father.

In 1982, W. Lee Lahrmann and others sued TUE in the District Court of Freestone County, claiming that the 35-year options were void under the Texas statutes pertaining to mineral leases of VLB land. The state court dismissed the lawsuit in 1985 for want of prosecution.

Meanwhile, HL & P and Northwestern had also been acquiring lignite leases in this area.[3] In 1979, HL & P and Northwestern entered a "Lignite Supply Agreement." This agreement established a lignite "Reserve Area" covering a large contiguous area in Limestone, Leon, and Freestone Counties, including the Lahrmann tracts. Under the agreement, HL & P sub-leased all of its lignite properties within the Reserve Area to Northwestern, agreed to build a lignite-burning generating plant in Limestone County, and agreed to purchase all of this plant's fuel requirements from Northwestern. In return, Northwestern agreed to attempt to acquire enough further reserves in the Reserve Area to supply the plant's expected 240,000,000 ton lignite requirements over its 30-year lifespan; to dedicate all of this reserve to HL & P; and to mine and deliver the lignite to the plant. Additionally, through this and subsequent agreements, HL & P agreed to purchase all of the permanent facilities necessary to mine the reserves, then lease this equipment to Northwestern for a nominal fee. This operation would become known as the Jewett Mine.

In 1986, TUE sold Northwestern a block of leases in the Reserve Area covering approximately 1300 acres, including the leases and options covering the Lahrmann tracts, in exchange for an overriding royalty. Concerned about the possible invalidity of the options on Lahrmann's land, Northwestern sent one of its landmen, Don McLaughlin, to obtain a ratification of these options. By this time, Lahrmann owned the property in fee simple, and it was no longer under VLB

---

1. The Plaintiff actually sued Utility Fuels, Inc., a sister company of HL & P. Since that time, however, Utility Fuels completely merged into HL & P, and HL & P was substituted as a Defendant herein. For the sake of simplicity, this opinion will refer to all activities of Utility Fuels as having been those of HL & P.

2. TUE is an electric utility which operates several lignite-fueled generating stations in Texas.

3. HL & P is an electric utility, and Northwestern is a mining company.

restrictions. Lahrmann executed the ratifications in 1987.

Don McLaughlin left Northwestern in April, 1991, knowing that Northwestern planned to prepare Lahrmann's land for mining that year. In September 1991, Lahrmann sold his tracts, plus all claims and causes of action related to them, to Plaintiff TCA Building Company. TCA is owned by a trust created by Don McLaughlin's brother, Houston attorney Michael McLaughlin.

*The Litigation*

Two months after purchasing the tracts, TCA sued Northwestern in the District Court of Freestone County for a declaration that the leases were void,[4] later adding TUE and HL & P as defendants. TCA claimed that the initial options were void under VLB regulations, and that the subsequent ratifications were void because they were procured through fraud. Northwestern maintained that its leases were valid, and continued preparing the TCA tracts for mining by stripping off the overburden and dewatering the subsurface. In November 1992, TCA informed Northwestern that it would seek more than $50 million in damages if Northwestern mined the tracts under the disputed leases.

Northwestern responded in February 1993 that it would simply bypass the TCA tracts, and not mine the land at all, if TCA did not recognize its right to do so without reservation. Northwestern also informed TCA that:

> In the progression of lignite production, once the production has passed the Lahrmann tract, it will not be economically feasible to move back and produce lignite from the Lahrmann tract. It is estimated that by May 1, 1993, the mining and reclamation operations will have bypassed the Lahrmann tract to the point that it is not economically feasible to produce lignite from the Lahrmann tract.

TCA balked, and Northwestern did, in fact, mine around the TCA tracts.

Despite its extant demand in the state court suit that Northwestern vacate its land,

TCA then amended its petition to include the bypass decision as part of its allegation of fraud. TCA also filed this action, alleging that the actions of the Defendants violated federal antitrust laws.

In December 1993, Northwestern unilaterally released its interest in these tracts to TCA.

Trial on the state court action commenced on January 31, 1994. At trial, TCA complained that the release was inadequate; Northwestern then filed a supplemental release to meet these complaints. After three weeks of evidence, the jury returned a verdict against TCA. Although the court had previously ruled that the initial 35-year options had been void when executed, the jury found that Northwestern had not obtained the ratifications by fraud. The jury also found that TCA was estopped to assert its claims, and that Northwestern's decision to mine around the TCA Tracts did not diminish the value of the lignite on TCA's land. Accordingly, the state court entered a take-nothing judgment against TCA on March 11, 1994.

*TCA's Antitrust Claims*

In its recently amended Complaint, TCA asserts that the Defendants have violated §§ 1 and 2 of the Sherman Act by a variety of means. First, TCA claims that the agreement of TUE to assign its lignite rights to Northwestern, and the supply agreements between Northwestern and HL & P, constituted a conspiracy to acquire monopoly power over the production and sale of lignite coal from the Jewett Mine. TCA also alleges that these agreements comprised an effort to fix the price of lignite in "the Jewett Mine market," and to monopolize the market for lignite to supply HL & P's Limestone County generating plant.

Next, TCA continues to assert that Northwestern fraudulently obtained the ratifications of the options on the TCA Tracts, "in furtherance of the conspiracy." TCA then vaguely asserts that the Defendants have "refus[ed] to deal" with the Plaintiff in the

---

4. Typical of the character of the pleadings bandied about by both sides of this lawsuit, Mike McLaughlin contends that he did not learn of the questionable validity of the leases until after he purchased the land. Given the circumstances, this assertion strains the credulity of the Court.

sale of its lignite interest, and have "set out on a course of conduct that has and will hinder Plaintiff's ability to efficiently exploit its lignite interest." Plaintiff supports the refusal to deal claim with evidence that HL & P has refused to purchase TCA's lignite on reasonable terms, and that Northwestern has refused to allow TCA access to the "essential" equipment which it leases from HL & P. TCA also alleges that the Defendants have filed false statements with the Texas Railroad Commission in order to renew their license to mine the Jewett Mine, have slandered Plaintiff's title, and have engaged in "sham litigation" against the Plaintiff. TCA supports this latter allegation by pointing to the counterclaims and third-party claims filed against it and the McLaughlins in the prior state court action.

### Standard of Review

General

■ Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. A genuine issue of material fact exists if there is a genuine issue for trial that must be decided by the trier of fact. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In other words, summary judgment should not be granted if the evidence indicates that a reasonable factfinder could find in favor of the nonmoving party. *Id. See also Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ In ruling on a Motion for Summary Judgment, the Court must accept the evidence of the nonmoving party and draw all justifiable inferences in his favor. Credibility determinations, the weighing of the evidence, and the drawing of reasonable inferences are left to the trier of fact. *Anderson v. Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513-14.

■ Under Fed.R.Civ.P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once this burden is met, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita, supra,* 475 U.S. at 585-87, 106 S.Ct. at 1355-56; *Leonard v. Dixie Well Serv. & Supply, Inc.,* 828 F.2d 291, 294 (5th Cir. 1987).

■ Where the moving party has met its Rule 56(c) burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no *genuine issue for trial.*" *Matsushita, supra,* 475 U.S. at 586-87, 106 S.Ct. at 1355-56 (quoting Fed.R.Civ.P. 56(e)).

*Dismissal*

■ Rule 12 of the Federal Rules of Civil Procedure provides for the dismissal of claims upon which relief cannot be granted. Under the notice pleading requirements of the Federal Rules, however, a complaint need only set forth "a short and plain statement of the claim." Fed.R.Civ.P. 8(a); *see also* Fed.R.Civ.P. 8(e)(1) ("Each averment of a pleading shall be simple, concise, and direct. No technical forms of pleadings or motions are required."), & 8(f) ("All pleadings shall be so construed as to do substantial justice."). Accordingly, motions to dismiss for failure to state a claim are disfavored in this circuit, and such a motion may not be granted unless "it appears to a certainty that the plaintiff would not be entitled to recover under any state of facts which could be proved in support of his claim." *Cook & Nichol, Inc. v. Plimsoll Club,* 451 F.2d 505, 506 (5th Cir.1971); *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957); *see McLain v. Real Estate Bd. of New Orleans,* 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980) ("This rule applies with no less force to a Sherman Act claim....").

## The Defendants' Motion

At several points in their brief, the Defendants raise issues in such broad terms that they cannot be reasonably read to meet their initial summary judgment burden of "informing the district court of the basis for [their] motion, and identifying those portions of [the record] which [they] believe[ ] demonstrate the absence of a genuine issue." For example, the brief introduces its section on the monopoly allegations by stating the elements of the claim and baldly asserting, without further support, that "TCA cannot establish either element." A general denial, however, does not pass to Plaintiff the burden of proving its entire case on summary judgment, especially when, as here, the parties have not completed discovery.[5] Accordingly, any arguments for summary judgment which the Defendants may have believed they raised and which are not addressed herein are summarily denied for lack of specificity.

Similarly, the Defendants' attack on TCA's complaint itself ignores the basic concept of the liberal notice pleading requirements in federal court, asking instead for a heightened pleading standard akin to that in civil rights cases. Moreover, the basis of the Defendants' criticism requires an assumption of illiteracy. For example, the Defendants deny that the complaint identifies the relevant product, geographic market, and parties, although these items are easily discerned from even a cursory review of the pleadings: the product is lignite, the geographic market is the Jewett Mine area, and the conspiring parties are the Defendants. Finally, the Court can only imagine that these alleged faults in the pleading form the basis of the Defendants' "motion to dismiss," presumably under Rule 12(b)(6), because their brief never actually specifies the relief requested from these phantom defects. Accordingly, except for the limited dismissal granted below, the Defendants' motion to dismiss is denied.

## Analysis

### State Law Claims

TCA's Amended Complaint makes vague references to causes of action arising under state law, such as a suit to quiet title, a request for an injunction against "sham litigation" in state court, and a request for judgment for "common law torts." In response to the Defendants' motion, Plaintiff conceded that the quiet title action is moot in light of Northwestern's release of all claims. As to any other claims TCA attempts to assert under state law relating to its dispute with the Defendants over its lignite rights, through due diligence TCA should have litigated these in the prior state court action. Accordingly, they are barred by *res judicata*. *See Barr v. Resolution Trust Corp.*, 837 S.W.2d 627, 628 (Tex.1992).

TCA also claims that the Defendants' alleged "sham litigation" was an act in furtherance of their alleged conspiracy to monopolize. In this context, the sham litigation claim will be discussed *infra*.

### Collateral Estoppel

The doctrine of collateral estoppel precludes the relitigation of any ultimate issue of fact which was actually litigated and essential to the judgment in a prior suit, as long as the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior suit. *Tarter v. Metropolitan Sav. & Loan Ass'n*, 744 S.W.2d 926, 927 (Tex.1988). In both Texas and federal courts, the doctrine applies even if the prior judgment is under appeal, except in those circumstances (not relevant here) where appeal consists of a trial de novo. *Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1, 6 (Tex.1986); *Prager v. El Paso Nat'l Bank*, 417 F.2d 1111, 1112 (5th Cir.1969).

In TCA's prior state court action against these Defendants, the primary issue

---

5. The Defendants also complain, in their reply to Plaintiff's response, that TCA cannot show that they exercised monopoly power by setting either monopolistic or monopsonistic prices. TCA is not, of course, *ever* required to make such a showing. *See American Tobacco Co. v. United States*, 328 U.S. 781, 811, 66 S.Ct. 1125, 1139– 40, 90 L.Ed. 1575 (1946) ("It is not necessary that the power thus obtained should be exercised. Its existence is sufficient."); *United States v. American Airlines, Inc.*, 743 F.2d 1114, 1118 (5th Cir.1984) (quoting same), *cert. dism'd*, 474 U.S. 1001, 106 S.Ct. 420, 88 L.Ed.2d 370 (1985).

was whether the Defendants had obtained the 1987 Lahrmann ratifications of the options on the TCA tracts through fraud. The jury found that they had not, and the court entered a judgment on those findings declaring the leases to be valid and enforceable. Hence, whether or not the options were initially valid,[6] the state court judgment establishes that TCA's predecessor-in-interest had granted Northwestern a valid right to mine the tracts long before TCA purchased them. Accordingly, TCA is collaterally estopped from denying in this forum that Northwestern's leases on the TCA Tracts were valid and enforceable after the 1987 ratifications, and any antitrust claims based on the Defendants' conduct in obtaining those ratifications are dismissed.

■ Likewise, TCA may not base any claim in this Court on a theory that actions of the Defendants which were permitted by these valid and enforceable leases were, in fact, pursuant to invalid leases. For example, the leases permitted Northwestern to dispossess TCA and Lahrmann of the surface estate, and to prepare the land for mining. These acts were not illegal, and cannot themselves form the basis of an antitrust claim. Moreover, TCA may not assert any "refusal to deal" claim arising from conduct occurring before December, 1993, because before that date TCA had no interest in lignite with which it could have dealt.

■ For a similar reason, Northwestern's decision to "mine around" the TCA Tracts cannot form the basis of any liability in this Court. Although far from clear, TCA's theory appears to be that this action furthered the conspiracy to monopolize the Jewett Mine and fix prices therein because "Northwestern, acting for all the monopolists, will either lease reserves at the price it sets, or will mine around lignite owners." As a general proposition, this statement is a truism: if a lignite owner refuses to lease to Northwestern at the price Northwestern is willing to pay, Northwestern will obviously have to mine around that deposit. With respect to TCA, however, the proposition is entirely irrelevant. As established in the

state court action, when Northwestern mined around the TCA Tracts in 1993 it already owned the right to mine those tracts, and TCA owned no right to the lignite therein. The Court does suspect that under state law Northwestern actually owed TCA, as a royalty-owner, the common-law duty to mine those tracts when it mined the surrounding properties. TCA, however, denied Northwestern's right to do this, and threatened to claim as damages any profits which Northwestern might make on mining the tracts. Under these circumstances, no reasonable fact-finder could conclude that Northwestern should have mined the property anyway. Therefore, TCA cannot claim that Northwestern's decision to mine around its property was improper.

■ On the other hand, the Defendants incorrectly argue that collateral estoppel precludes entirely the issue of damages. In one of many blatant misrepresentations to the Court, the Defendants baldly claim that the state court findings "established that there was no diminution in value of TCA's surface and lignite estate." In fact, the jury only found that Northwestern's *decision to mine around* the TCA Tracts did not diminish the value of the lignite therein. Moreover, even this finding does not enjoy the benefits of collateral estoppel, as the Defendants have not suggested—and the Court has not culled from the record before it—any reason that this finding was essential to the judgment entered by the state court. *See Tarter,* 744 S.W.2d at 927 (collateral estoppel applies only to finding essential to judgment in prior suit).

■ Also, contrary to the implications of the Defendants' motion, collateral estoppel does not govern every liability issue raised by TCA's Amended Complaint. It is, of course, possible to violate the antitrust laws through activities which, in the absence of anti-competitive intent, are entirely valid and legal. *See, e.g., Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) (holding that circumstances justified finding that de-

---

6. Both parties also attempt to re-litigate here the question of the options' initial validity. The par-

ties' attempt to reveal the relevance of this inquiry, however, has been unavailing.

fendant's refusal to continue joint ticket arrangement with smaller competitor violates Sherman Act). The question here, then, is whether TCA can show that the ostensibly valid actions of the Defendants had the effect or purpose of unlawfully suppressing competition.

*Sham Litigation*

 TCA claims, among other things, that the Defendants interfered with its efforts to compete by pursuing "sham litigation" against it and the McLaughlins through their counter and third-party claims in the state court suit. In that action, Defendant Northwestern claimed that TCA and the McLaughlins conspired to violate Don McLaughlin's alleged duty not to reveal Northwestern's concerns about the validity of the initial coal options on the TCA tracts. The Defendants move for summary judgment on this allegation, which the Court grants.

First, TCA's global claim of sham litigation is clearly meritless as to HL & P and TUE because these Defendants never joined the allegedly sham claims of Northwestern in the state court action. TCA's refusal to acknowledge this could only be for the purpose of harassment, in violation of its duty to this Court.

 Second, a party is generally immune from antitrust liability based on its having petitioned a court for redress. *California Motor Trans. Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). To pierce this immunity, TCA must first show that, as a matter of law, Northwestern's claims were "objectively baseless, in the sense that no reasonable litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome." *Professional Real Estate Inv. v. Columbia Pictures Indus.*, — U.S. —, —, 113 S.Ct. 1920, 1922, 123 L.Ed.2d 611, 624 (1993). Even if

the claims were objectively baseless, however, TCA must further show that Northwestern subjectively intended the prosecution of the claims to interfere directly with the business relationships of a competitor, through the use of the governmental process as opposed to the outcome of that process. *Id.*

 TCA offers neither argument nor evidence supporting either prong of this test. Furthermore, on an independent analysis, the Court finds that Northwestern's claims were not objectively baseless. It is well established in Texas that at least some employees owe their employers a duty not to disclose certain secrets. *See, e.g., Hunter v. Shell Oil Co.*, 198 F.2d 485, 487 (5th Cir.1952) (geologist owes fiduciary duty to oil company employer with regard to company's confidential information about oil deposits). Northwestern's theory that this obligation included a duty by Don McLaughlin to not disclose the legal vulnerability of certain of his employer's contracts was, objectively, at least a good faith argument for the extension of existing law.[7] *Cf. id.* — U.S. at —, 113 S.Ct. at 1931, 123 L.Ed.2d at 627 (incorporating standard of Fed.R.Civ.P. 11). Even if not, however, TCA has failed to show even the possibility of subjective anticompetitive intent. Northwestern's "sham litigation" was a counterclaim to a suit brought by TCA. The jury, in turn, found TCA's suit to be lacking in proof. TCA has not shown how the efficient prosecution of Northwestern's "baseless" claims at the same time as TCA's pursuit of its "baseless" primary action could remotely interfere with any of its "business relationships." Nor has TCA even identified any business relationships which existed at the time of filing and with which the litigation could have interfered. In fact, TCA has not even offered a description of Northwestern's actions from which this Court could determine that the process of defending against these claims burdened TCA at all. Accordingly, the claim must fail.

---

7. Northwestern further argues that "[t]he fact that those claims were not baseless is established by the state court's refusal to direct a verdict on them." Of course, the state court's refusal to direct a verdict is probative of nothing, and this statement could not be sincerely made by anyone with even a passing familiarity with the mechanics of trial.

*Limitations*

█ Section 4B of the Clayton Act bars any private cause of action for treble damages under the antitrust laws which is not commenced within four years after the cause of action accrued. 15 U.S.C. § 15b. TUE argues that, since it has not done anything in relation to the Jewett Mine or to any interest therein owned by TCA since 1986, and this action was not filed until 1993, any antitrust cause of action by TCA against TUE is clearly time-barred. HL & P and Northwestern also claim the benefit of the limitations statute, on the theory that they completed the alleged conspiracy and monopoly when they obtained the ratifications of the Lahrmann options in 1987.

In response, TCA simply makes the conclusory statement that it has pled "continuing antitrust violations," for which the limitations period is continuously renewed, citing *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n. 15, 88 S.Ct. 2224, 2236 n. 15, 20 L.Ed.2d 1231 (1968). Even assuming the truth of this conclusion, however, Defendant TUE's involvement with this "continuing violation" cannot be discerned.

█ The "continuing violation" or "continuing conspiracy" exception to the four-year antitrust statute of limitations "permits a cause of action to accrue whenever the defendant commits an overt act in furtherance of an antitrust conspiracy or, in the absence of an antitrust conspiracy, commits an act that by its very nature is a continuing antitrust violation." *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1051 (5th Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983).[8] The only act which the Plaintiff accuses TUE of which could be classified "by its very nature" as a "continuing antitrust violation" is TUE's alleged participation in a monopoly. However, TCA neither alleges nor presents evidence of anything TUE has done in relationship to the Jewett Mine since assigning its lignite leases to Northwestern in 1986, other than receive royalties from those leases. The undisputed evidence on file establishes that TUE re-

tained no ownership interests in the Jewett Mine, the Limestone County generating plant, or the TCA Tracts, after 1986. Furthermore, TUE played no role in any decisions concerning the mining of the Jewett Mine or the operations of the generating plant.

█ This Court holds as a matter of law that a party does not continually violate the antitrust laws simply by virtue of its mere passive receipt of royalties from a monopoly which purchased its previously competing interests. *Cf. Greene County Mem. Park v. Behm Funeral Homes*, 797 F.Supp. 1276, 1292 (W.D.Pa.1992) (mere existence of partnership or shareholder interest in a conspiring firm does not give rise to personal liability under the Sherman Act), *aff'd* 993 F.2d 876 (3rd Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 187, 126 L.Ed.2d 146 (1993). Otherwise, the passive participant would be perpetually liable for the existence of a violation which it is powerless to end. Therefore, since there is no suggestion in the record that TUE has retained the ability to alter any unlawful monopoly in Jewett Mine area lignite since 1986, the existence of any such monopoly is not a "continuing violation" on the part of TUE.

█ The Plaintiff's remaining allegations against TUE—that TUE conspired with the other Defendants to monopolize the Jewett Mine and fix the price of the lignite therein—fail for the lack of any overt act in furtherance of the conspiracy since 1986. As the Fifth Circuit has explained, in the context of conspiracy claims:

[C]ontinuing antitrust conduct resulting in a continued invasion of a plaintiff's rights may give rise to continually accruing rights of action. It remains clear nonetheless that a newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action.

*Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971).

---

**8.** TCA does not claim the benefit of the speculative damages exception described in *Zenith Radio*

Poster Exchange, Inc. v. National Screen Service Corp., 517 F.2d 117, 128 (5th Cir. 1975) (footnote omitted), cert. denied, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976). TCA points to no "injurious act" done by TUE, or any active participation by TUE in any alleged conspiracy, within four years of this suit. Since any damages which TUE may have caused TCA have occurred solely because of the inertial consequences of TUE's pre-limitations actions, TCA's claims against TUE are barred. Compare Al George, Inc. v. Envirotech Corp., 939 F.2d 1271, 1275 (5th Cir.1991) (antitrust action based on sham litigation accrues when prior lawsuit was filed, and continued prosecution of that action within the limitations period does not create a new action), and Kaiser Aluminum, 677 F.2d at 1052–55 (conspiring defendants' continuing receipt of benefits from illegal contract does not create new causes of action), with Poster Exchange, 517 F.2d at 129 (cause of action for refusal to deal is renewed with every specific act or word of refusal).

HL & P and Northwestern also assert the benefit of the limitations statute, on the theory that they had completed their exclusive dealing arrangement and monopoly of the Jewett Mine well before 1989. They are correct, of course, only to the extent that TCA claims damages specifically arising from pre–1989 events. Otherwise, the maintenance of monopolies and agreements in restraint of trade are the classic examples of "continuing violations" of the antitrust laws. See Hanover Shoe v. United Shoe Mach. Corp., 377 F.2d 776, 794–95 (3d Cir.1967) (cause of action renewed each time defendant enforced and renewed monopoly-creating leases), aff'd in relevant part, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); Poster Exchange, supra. Therefore, if these Defendants' more recent refusals to deal with TCA were in furtherance of an unlawful agreement or monopoly, TCA's damages flowing therefrom are clearly not barred by limitations.

9. In theory, the Court could imagine one reason that HL & P would actually agree to pay inflated prices for its own coal: given that HL & P is a

Price–Fixing: Failure of Claim and Lack of Standing

 TCA claims that the lignite supply agreements between Northwestern and HL & P constitute a price-fixing conspiracy. Furthermore, TCA describes the conspiracy as horizontal as well as vertical; that is, TCA claims that the agreement is not simply an agreement between HL & P and Northwestern as buyer and seller, but is also an agreement between sellers of Jewett Mine lignite because HL & P owns Jewett Mine lignite leases which it has subleased to Northwestern.

 Of course, as between an individual buyer and an individual seller a vertical "price-fixing agreement" is not only lawful, but expected. If buyer and seller could not fix a price, nothing would ever get sold. This explains TCA's creative attempt to classify both Defendants as sellers, since horizontal price-fixing agreements are per se illegal under § 1 of the Sherman Act. United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927).

 In this posture, however, the claim must be dismissed for failure to make sense. Price-fixing agreements are illegal because they restrain competition based on consumers' preferences, such as the price, service, or quality associated with a given product. Albrecht v. The Herald Co., 390 U.S. 145, 152–54, 88 S.Ct. 869, 872–74, 19 L.Ed.2d 998 (1968). The party most directly harmed by such agreements is the consumer of the subject product. Cf. ARCO v. USA Petroleum, 495 U.S. 328, 336, 110 S.Ct. 1884, 1890, 109 L.Ed.2d 333 (1990). Yet TCA asserts that HL & P, as one of two dominant owners of Jewett Mine lignite, conspired with the other owner to fix the price of said lignite, even though the party most obviously injured by such a conspiracy would be the sole consumer of this ore: HL & P. Given the lack of reason to this theory, the Court holds as a matter of law that masochism on the part of a vertically-integrated consumer is not, by itself, a violation of the Sherman Act.[9]

state-regulated utility holding monopolies in various markets for electricity, the payments to Northwestern would appear as legitimate third-

Put simply, TCA's complaint describes only a situation in which one coal-owning party—HL & P—agreed to purchase a package of mining services and additional coal from another—Northwestern. Northwestern and HL & P could not have been competing for the sale of HL & P's coal to HL & P, because HL & P already owned it. Likewise, Northwestern did not compete with HL & P for the provision of mining services, because HL & P has no such operations. Therefore, the complaint describes no agreement between competitors and hence no horizontal price fixing agreement.

 Moreover, even if Northwestern and the "coal-owning" branch of HL & P could be said to have fixed lignite prices in violation of § 1, TCA would not have standing to complain. As a potential seller of lignite, TCA is a competitor of these alleged conspirators. To maintain an action for damages arising from violations of the Sherman Act, a plaintiff must show that he suffered an "antitrust injury"; that is, an injury which is "of the type that the antitrust laws were intended to prevent, and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). In the context of a price-fixing conspiracy among sellers in a given market, this means that competitors "may not complain of conspiracies that ... set maximum prices above market levels, or that set minimum prices at *any* level" because, absent predatory pricing, such conspiracies "would either leave [the competitor] in the same position as would market forces or would actually benefit respondents by

raising market prices." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 584 n. 8, 106 S.Ct. 1348, 1355 n. 8, 89 L.Ed.2d 538 (1986). As a potential competitor of the Defendants in the market for Jewett Mine lignite, therefore, TCA has no cause of action based on the Defendants' alleged conspiracy to fix the price of that commodity.

TCA's inability to allege such an antitrust injury is further established by the TCA's claimed damages. TCA does not allege that the supposedly "fixed" price has harmed it; in fact, it claims a willingness to sell its coal at a substantially lower price than that paid to Northwestern.[10] Instead, TCA simply claims that the harm it has suffered is an inability to sell its lignite at all. While that may be the result of antitrust violations, it has nothing to do with "price-fixing." Accordingly, any claims for "price-fixing" are dismissed.

 Therefore, at this point the only remaining viable claims of TCA are:

1) That Northwestern and HL & P have, through otherwise legitimate means, unlawfully monopolized or attempted to monopolize the market for lignite in the Jewett Mine area, in violation of § 2 of the Sherman Act; and

2) That the requirements/exclusive dealing contract between Northwestern and HL & P constitutes an unlawful agreement in restraint of trade, in violation of § 1 of the Sherman Act.

The only cognizable antitrust injury TCA alleges is that, in furtherance of these two

---

party expenses in HL & P's rate applications. Therefore, the regulating agency might set rates for HL & P which appear to be reasonable but which would, in fact, allow HL & P to gain monopoly profits through the monopoly prices it pays to itself for coal supplies.

TCA, however, has neither pled nor argued such a motive. Rather, Plaintiff states in its Amended Complaint that HL & P's motive for entering the lignite supply agreements was perfectly legitimate:

> In order to operate efficiently, and profitably, that is to say to benefit both ratepayers and investors, electric utilities relying on fossil fuels as an energy source must have secure fuel supplies and supply sources to insure con-

tinuous production capacity. The more efficient a production unit (such as Limestone County Nos. 1 and 2) is, the more profitable the power company can be because efficient production insures sales of over-capacity to less efficient producers on the power grid.... [T]he more secure the fossil fuel supply—the more efficient the generating station.

Plaintiff's Amended Complaint ¶ 10. Furthermore, this admission by TCA goes far to negate the theory that the Defendants' requirements contract unlawfully restrains trade. The Defendants, however, have not argued this admission as a basis for summary judgment.

**10.** Hence the "predatory pricing" exception of *Matsushita* is inapplicable.

violations, HL & P has effectively refused to purchase TCA's coal, and Northwestern has refused to provide TCA access to its "essential facilities" for marketing that coal to HL & P.[11]

*Other Standing Issues*

■ The Defendants also claim that TCA lacks antitrust standing for these remaining claims. The argument is largely a collection of indecipherable, jumbling, and unconnected pieces of antitrust headnotes, with no description of their relevance to the case at hand or their discernible relationship to the question of standing. The Defendants do cite the seminal case on the issue, *Associated Gen. Contractors v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). They do so in an utterly conclusory manner, however, with no mention whatsoever of the detailed list of factors the Supreme Court offered therein for the proper analysis of the issue. The thrust of the Defendant's argument, to the extent one can be discovered, appears to be encapsulated in the heading of that section: TCA lacks standing because it is "neither a damaged consumer nor a competitor" of the Defendants. Without more, however, this major premise is derived from an overly broad and simplistic reading of controlling antitrust jurisprudence. *See, e.g., Blue Shield v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) (patient of psychologist has standing to complain of conspiracy by insurance companies and psychiatrists against psychologists).

Furthermore, Northwestern's premise that TCA is not its competitor is unsupported factually. Since December 1993, when the Defendants unilaterally released their rights to mine the TCA tracts, TCA has been an owner of lignite in the Jewett Mine market. TCA has entered negotiations with companies interested in mining these tracts for TCA, and has attempted to negotiate a the sale of its lignite to HL & P. Nonetheless, the Defendants argue that TCA is not a viable competitor in this market because it has no mining permit, mining equipment, or experienced mining personnel. Reason, however, does not support the notion that a seller of minerals does not "compete" in the market for those minerals simply because it intends to contract the operation of its mine to others.

As a competitor for sales of lignite in a market which the Defendants have allegedly monopolized, which has allegedly lost sales due to the Defendants' allegedly unlawful agreement to exclude competitors, no party is in a better position to vindicate the purposes of the antitrust laws than TCA. *Cf. R.C. Dick Geothermal Corp. v. Thermogenics, Inc.,* 890 F.2d 139, 158 (9th Cir.1989) (Norris, J., dissenting) (noting that a utility, as a regulated monopoly which can pass most of its costs on to consumers, has little motivation to sue its fuel suppliers for antitrust violations).[12] Accordingly, based on the extant pleadings and evidence in the record, and the lack of reasoned argument to the contrary, the Court finds that TCA is the proper party to bring this suit.

*Market Allegations*

■ The Defendants assert that TCA's complaint should be dismissed for failure to

---

11. The Defendants argue for summary judgment on the grounds that they have not, in fact, refused to deal with TCA. To this end, HL & P claims to have accepted TCA's offer of sale, and Northwestern claims to have "discussed with TCA the possibility of contract mining." TCA's evidence, however, strongly indicates that these statements are not true and that, in fact, the Defendants have only "discussed" dealing with TCA on the basis of clearly onerous terms. For example, HL & P has "agreed" to purchase TCA's lignite at the bargain price offered, but only if TCA meets conditions such as posting a $6.75 million bond against unspecified possible losses. Such a dichotomy of possible fact findings is a textbook example of a "genuine issue" for trial.

12. The Defendants cite *Thermogenics* for the bald proposition that "[a] disgruntled landlord or lessor lacks standing to bring a Section 2 case because a lessor's injuries are not the kind of injuries to competition that the antitrust laws are meant to prevent." This statement calls for two comments. First, the breadth of this proposition is facially preposterous and, of course, unsupported by the cited authority. Second, to the extent that the case otherwise supports the Defendants' motion, the Court would note that, for the most part, the dissenting opinion to that 6–5 en banc decision demonstrates a much more learned appreciation of the current state of antitrust law.

allege a "legally relevant market," claiming that "[t]o the extent that TCA is claiming that the Jewett Mine area is a legally relevant market, it is wrong as a matter of law." In support of this proposition, they cite a case in which a plaintiff defined the relevant market as the market for disseminating one particular trademarked health education program called "Growing Healthy." *Re–Alco Indus., Inc. v. National Center for Health Educ., Inc.,* 812 F.Supp. 387 (S.D.N.Y.1993). There, the court properly held that a single copyrighted or trademarked brand of a seller cannot comprise its own "market" for the purposes of antitrust law. *Id.* at 391. This conclusion should be obvious; the trademark laws *grant* the seller of a trademarked brand a monopoly in that brand of a product, and the relevant market for antitrust purposes consists of that brand's reasonable substitutes. *Id.*

Amazingly, however, the Defendants then simply state: "So it is here." To support this conclusion, they first add "or product" in their version of the *Re–Alco* holding, without mentioning the qualifying language "copyrighted or trademarked." Defendant's brief at ¶ 28. Then they argue that the coal mined by Northwestern is Northwestern's own "product," in which it has a natural monopoly. The Court can assure the Defendants, however, that no other erstwhile rational being would dare to credit this assertion with any appellation more generous than ludicrous, or downright silly. The plaintiff has not complained of a monopoly in "Northwestern lignite;" it complained of the Defendants' monopoly in lignite from the Jewett Mine area. This lignite is "naturally" capable of being produced by any party who purchases the right to do so from the various landowners in that area. Northwestern did not create this product, and in fact the rights to the product used to be leased by at least three separate and distinct entities. The prevention of monopolies and restraints on trade in such a "product" with cross-elasticity of demand between various potential sources is, of course, the very essence of the Sherman Act. If the Defendants consolidated significant market power over this product through anticompetitive means, clearly they have created an unlawful monopoly, and their argument to the contrary is disingenuity approaching the obscene.

As if to underscore the frivolity of this argument and the inability to follow the conclusion with any reason, the Defendants again in this section digress to utterly irrelevant statements made, apparently, for the sole purpose of filling paper. After stating that as a matter of law the Jewett Mine market is a natural monopoly, they (in the same paragraph) segue into the statement that their monopoly is not illegal because it was gained by conduct that was honestly industrial. While this may certainly be true, and might vindicate the Defendants if proven, it has nothing whatsoever to do with the question of whether the allegation of a monopoly in Jewett Mine area lignite gained through *un*industrial and *anticompetitive* conduct states a claim for which relief may be granted. Since the answer to that question is clearly that it does, the Defendants' motion to dismiss on this basis defies sense.

*State Action Doctrine*

The Defendants' journey through Wonderland continues with a claim that the "state action doctrine" precludes TCA's complaint. Under this doctrine, restraints on trade are immune from antitrust liability if they have been clearly articulated and affirmatively expressed as state policy, and if this policy is actively supervised by the state itself. *FTC v. Ticor Title Ins. Co.,* — U.S. —, —, 112 S.Ct. 2169, 2176, 119 L.Ed.2d 410, 422 (1992). The Defendants' sole argument based on this doctrine is that, since the State of Texas regulates strip mining from cradle to grave and has licensed only Northwestern to mine the Jewett Mine, the *Ticor Title* test is satisfied.

Again, the Defendants provide absolutely no support for this conclusion. They point to no policy wherein the State of Texas even suggests a preference for having only one company mine a given area of lignite deposits, much less clearly articulates such. They do not argue that TCA or its contractors could not obtain a permit to mine in the Jewett Mine area. They enlighten the Court of no state policy favoring exclusive dealing arrangements between mining companies

and utilities. In short, they present no state policy which necessarily conflicts with federal requirements that they compete for mineral reserves in the Jewett Mine area in accordance with the Sherman Act.

Instead, the Defendants offer only this statutory language:

> The State of Texas wishes to assume exclusive jurisdiction over the regulation of surface coal mining and reclamation operations within the State.... It is therefore declared to be the purpose of this Act: to prevent the adverse ·effects to society and the environment resulting from unregulated surface coal mining operations as defined by this Act. Tex.Rev.Civ.Stat.Ann. art. 5920–11, § 2, ¶ 5(a) (Vernon's Supp. 1994).

This statement is, of course, utterly devoid of probative value under the *Ticor* test. *Compare Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) (state approval of illegal tying arrangement by public utility does not give rise to immunity, because approval does not express adoption or supervision of policy). Like a mine with its reserves depleted and its framework removed, the Defendants' argument once more is wholly without value or support.

*Interstate Commerce*

█ Finally, in an argument not given serious consideration since the *Lochner* era,[13] the Defendants propose that this Court lacks jurisdiction over TCA's claims because their activities do not affect interstate commerce, pointing to the Sherman Act's proscription only of those monopolies in, and those restraints of, trade or commerce "among the several states." 15 U.S.C. §§ 1 & 2. In the absence of any basic education on the issue, the argument might be persuasive: the Jewett Mine is located entirely within Texas, the entire output of the mine feeds a Texas generating plant, and the entire electrical output of that plant is sold within Texas. Consideration of the facts of this case in light of the broad and well-established judicial interpretations of the Act's interstate commerce requirement, however, cannot lead to the Defendants' conclusion without a wholesale misrepresentation or concealment of that jurisprudence. As before, unfortunately, deception is the Defendants' battle cry. For example, they cite a 1980 Tenth Circuit opinion—*Crane v. Intermountain Health Care, Inc.,* 637 F.2d 715 (10th Cir.1980)—for the propositions that "for jurisdictional purposes, plaintiff must point to relevant channels of interstate commerce logically affected by defendants' allegedly unlawful conduct," and that "[i]t is insufficient that defendants' *overall* business may impact interstate commerce if the challenged activity is ... unrelated to interstate commerce." Both suggestions, however, have since been plainly rejected by the Supreme Court. Rather, in Sherman Act cases "[plaintiff] need not allege, or prove, an actual effect on interstate commerce to support federal jurisdiction." *Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 331, 111 S.Ct. 1842, 1848, 114 L.Ed.2d 366, 376 (1991). "A conspiracy ... would be covered by the Sherman Act, even though any actual impact on interstate commerce would be indirect or fortuitous." *Id.* at 329, 111 S.Ct. at 1847, 114 L.Ed.2d at 375.

█ Indeed, *Crane* is cited by the *dissent* in *Summit Health* as being contrary to the holding of the Court. *Id.* at 334–38, 111 S.Ct. at 1850–51, 114 L.Ed.2d at 379 (Scalia, J., dissenting). The *majority* opinion observed that it is "well established" that the Sherman Act reaches all activities which Congress has the constitutional power to regulate under the Commerce Clause. *Id.* at 327–31 n. 10, 111 S.Ct. at 1846–47 n. 10, 114 L.Ed.2d at 374 n. 10; *Chatham Condominium Ass'n v. Century Village, Inc.,* 597 F.2d 1002, 1006 (5th Cir.1979). Congress, in turn, enjoys the constitutional power under the Commerce Clause to regulate *any* activity which may be *rationally* found to affect interstate commerce. *Heart of Atlanta Motel,*

---

**13.** This is only a slight exaggeration; the argument may have had some merit in this Circuit twenty years ago. *See Rosemound Sand & Gravel Co. v. Lambert Sand & Gravel Co.,* 469 F.2d 416 (5th Cir.1972) (finding no Sherman Act jurisdiction in dispute between local gravel companies where defendant's products were mined and sold only intrastate, despite out-of-state character of plaintiff, its potential purchaser, and defendant's suppliers, and defendant's use of Mississippi River and interstate highways).

*Inc. v. United States,* 379 U.S. 241, 258, 85 S.Ct. 348, 358, 13 L.Ed.2d 258 (1964). The question, then, is clearly *not* whether Jewett Mine lignite or HL & P electricity is in interstate commerce, but simply whether it would be rational to conclude that restraints on trade in lignite from the Jewett Mine area could affect interstate commerce. The only serious answer to this inquiry is "yes."

Defendant Northwestern is a Montana corporation; HL & P, a Texas company. The engineers and managers employed at the Jewett Mine undoubtedly hail from across the country. The mine necessarily requires the use of numerous pieces of heavy equipment, many of which are manufactured in other states. Electricity is generated at the Limestone County plant by generators built out-of-state, and it is used in the furtherance of interstate commerce passing through highways, airports, and shipping ports. HL & P expects Northwestern to supply its Limestone County generating plant with 240,000,000 tons of lignite over the plant's 30–year lifespan, displacing HL & P's reliance on other fuel supplies which might be purchased in interstate commerce. Clearly, therefore, the conclusion that the Defendants' operation of the Jewett Mine affects interstate commerce is not only rationally permitted, but rationally commanded. *Compare Hodel v. Virginia Surface Mining & Reclam. Ass'n,* 452 U.S. 264, 281–83, 101 S.Ct. 2352, 2362–64, 69 L.Ed.2d 1 (1981) (the commerce clause permits Congress to regulate wholly local surface mining operations done by wholly local companies, where Congress rationally found that these operations generally could affect the environment in other states).

Moreover, even under the Defendants' test requiring a logical connection between the effects of the challenged activity and interstate commerce, the Sherman Act plainly reaches the allegations of TCA's complaint and the evidence in support thereof. TCA's complaint alleges that two parties from different states have unlawfully monopolized the production of lignite in the Jewett Mine area, and have unlawfully agreed to restrain trade in that lignite. The evidence supports a finding that, in the absence of such re-

straints, mining companies located in other states would attempt to compete for the right to produce lignite from that area. These companies might obtain financing from interstate loans or shareholders. Therefore, if the violations alleged are true, the Defendants' conduct has clearly poses a threat to interstate commerce. "If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." *United States v. Women's Sportswear Ass'n,* 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949). The Defendants' argument to the contrary is, once more, wholly without foundation in law or fact. *Compare Summit Health, supra* (local doctor's allegations of conspiracy by local peer review committee at local hospital satisfies Sherman Act jurisdictional requirements, where hospital's overall activities affect interstate commerce); *Hospital Bldg. Co. v. Rex Hosp. Trustees,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (local hospital may bring Sherman Act suit against another local hospital and its local officials for conspiracy to restrain plaintiff hospital's expansion, where failure to expand would restrict interstate medicine sales and financing); *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 783–85, 95 S.Ct. 2004, 2011–12, 44 L.Ed.2d 572 (1975) (local conspiracy to set fees of local attorneys performing local residential title services is within purview of Sherman Act, where many home purchases are financed with interstate and federal loans); *Park v. El Paso Bd. of Realtors,* 764 F.2d 1053, 1063 (5th Cir.1985) (El Paso real estate broker's complaint of boycott by other El Paso brokers implicated Sherman Act, where actions of brokers generally affect demand for interstate financing, title insurance, and advertising), *cert. denied,* 474 U.S. 1102, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986).

## Conclusion

From the 40 pages of dross argued by the Defendants, the Court has found very few jewels, and most of these are only semiprecious. Based on these, it is **ORDERED** that (1) all state law claims are **DISMISSED** as barred by *res judicata;* (2) under the doctrine of collateral estoppel, the 1987 ratifications of the options on the Lahrmann

tracts are **DEEMED VALID AND EN-FORCEABLE;** (3) all sham litigation claims are **DISMISSED;** (4) all claims against Defendant TUE are **DISMISSED** as time-barred; and (5) all price-fixing claims are **DISMISSED** for failure to state a claim upon which relief can be granted.

Otherwise, all other requests for relief claimed by the Defendants are **DENIED.** The rest of the Defendants' motion is characterized by misrepresentation of both law and fact, and argument too illogical and disingenuous to even warrant the distinction of chicanery.[14] The Court is both alarmed and disturbed to note that the motion was presented over the names of some of the most distinguished attorneys in the state. Clearly, the ethical level of advocacy presented therein is far below the standards normally associated with either those individuals or their respective law firms. The Court assumes that this aberration arose simply from a temporary inability to dedicate appropriate resources to this case at the time they were needed. The Court knows, however, that through this motion the Defendants have stolen countless hours of the Court's time, and hence deprived countless other litigants of a more timely resolution of their needs.

This will not happen again in this case. Further pleadings of this character will not be considered by the Court prior to trial. Moreover, the parties will be given only one more opportunity to file dispositive motions. To this end, the pretrial Order of March 2, 1994, is **AMENDED** to allow the filing of one dispositive motion by each party on or before October 28, 1994. The responses to these motions, if any, will be due November 18, 1994, and no such motions will be considered before that date. Replies to responses will be neither required nor permitted.

Given the February trial setting of this case, the docket of this Court, and the holidays intervening between these deadlines and trial, the Court strongly suggests that the issues raised by any such motions be limited in number and based on clearly established grounds. To this end, the parties

are advised that, if the Court is unable to carefully consider the motions before trial, it will simply require their re-briefing afterwards in the form of post-trial motions.

Although the Court is loathe to research the law for its litigants, it is also loathe to grant trials on meritless cases. Therefore, the Court suggests that the parties direct at least part of their further attention to *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). If the original agreement by Northwestern and HL & P to exclude dealings with other parties was permissible, it is immaterial that these Defendants are now refusing to deal with TCA, whether pursuant to that contract or otherwise. This, in turn, was the exact issue considered by the Supreme Court in *Tampa Electric*: the antitrust legality of a public utility's contract with a local mining concern for all of its coal requirements at a local generating plant. Like the Court suspects will be a principle issue in the case at bar, the *Tampa Electric* court considered the proper standards to be applied in determining the size of the geographic market in which a contract allegedly restrains trade. Although the Supreme Court decided that case under § 3 of the Clayton Act, if the Defendants' arrangement passes muster by that standard it is necessarily valid under the narrower strictures of the Sherman Act. *Id.* at 335, 81 S.Ct. at 632.

Finally, the parties are further OR-DERED to file no further pleadings on any of the issues finally disposed of by this Order in this Court, including motions to reconsider and the like, with one exception. If the parties can present to the Court compelling and relevant new evidence or legal authority affecting an issue, which they could not through the exercise of due diligence have presented on original submission of this motion, the parties are invited to bring these to the Court's attention at the time designated above. Otherwise, the parties are instructed to seek any further relief to which they feel themselves entitled in the United States

---

**14.** This critique is not intended as praise by omission for the Plaintiff's advocacy. Against a well-reasoned and factually-supported motion, TCA's cursory and conclusory responses would have been woefully insufficient.

Court of Appeals for the Fifth Circuit, as may be appropriate in due course.

IT IS SO ORDERED.