David O'DELL, d/b/a A & B
Speedometer Radio
Inc., et al.

v.

**GENERAL MOTORS CORP., and
Delco Electronics Corp.**

No. 9:98–CV–123.

United States District Court,
E.D. Texas,
Lufkin Division.

Oct. 6, 2000.

George M. Fleming, Rand Patrick Nolen, James L. Doyle, Gregory Sean Jez, Fleming & Associates, Houston, TX, for Plaintiff.

Ernest Ryan Higginbotham, Kay Lynn Brumbaugh, Strasburger & Price, Dallas, TX, William B. Slowey, GMC—Legal Staff, Detroit MI, for Defendant.

## MEMORANDUM OPINION

COBB, District Judge.

This is a dealer termination case filed by 18 unaffiliated radio repair shops ("Plaintiffs") against Defendants General Motors ("GM") and Delco Electronics Corporation ("Delco"). Plaintiffs are former authorized Delco radio repair shops whose contracts were terminated or not renewed by Defendants. Plaintiffs' businesses have suffered as a result of the loss of the contracts and, therefore, they seek assistance in this Court. Plaintiffs allege that their termination violates several federal antitrust laws. They also contend that Defendants' conduct violates Texas contract law and California and Indiana consumer protection law. Defendants move for summary judgment on the antitrust claims and the Texas contract law claim. Plaintiffs move for summary judgment on their state consumer protection law claims. After re-

viewing the evidence[1] on Plaintiffs' antitrust claims, the Court grants Defendants' motion on the (1) conspiracy claim because Plaintiffs have presented no evidence of any conspiracy between Defendants and the remaining authorized service centers or evidence of the anticompetitive effects of Defendants' conduct; (2) price discrimination claim because Plaintiffs have presented no evidence that the indirect purchaser doctrine is applicable to their case and, even if it is applicable, they have not offered sufficient evidence that Defendants discriminated in terms of price; and (3) attempted monopolization claim because Plaintiffs have offered no evidence of Defendants' market power. The Court denies Defendants' motion on the Texas contract claim and Plaintiffs' motion on the California and Indiana state law claims. Moreover, because jurisdiction was premised on the now dismissed federal antitrust claims, the Court dismisses Plaintiffs' state law claims without prejudice, allowing them to seek redress in state court. The Court presents the facts in the light most favorable to the Plaintiffs.

## I. *Facts*

Defendant GM is the largest automobile manufacturer in the world. It manufactures and sells radios and other products primarily for use in GM automobiles through its Service Parts Operations ("GMSPO") and ACDelco, a subsidiary of GMSPO. GM also manufactures and sells radios and other products primarily for use in GM automobiles through its Delco subsidiary. For all relevant times in this lawsuit, Delco was a wholly owned subsidiary of GM.

Plaintiffs are the owners of businesses that perform radio and electrical instrument repairs. When a GM car is taken to a dealer to work on its Delco radio (or other electrical device), the dealership contracts with a "Delco shop" to perform the work. Plaintiffs were owners of such shops and performed warranty and non-warranty repairs on Delco products, including selling Delco parts and radios, speedometers, odometers, and tachometers.

In order to become an authorized Delco shop, Defendants required that the shop purchase certain equipment, some of which could only be used to service Defendants' products. Delco shops were also required to stock certain inventory, attend training classes, and perform a minimum amount of Delco business each month. Plaintiffs and Defendants had entered into service center agreements or warehouse distribution agreements with these Delco shops. The service center agreements permitted the repair shops to perform warranty repair service for which GM paid the service center. These agreements also permitted either party to terminate the agreement, with or without cause, upon 30 days notice. The warehouse distributor agreements permitted the repair shops to obtain parts from GM and its subsidiaries, including Delco, and also permitted either party to terminate the agreement.

Defendants terminated or did not renew many of these agreements with Plaintiffs. Defendants maintain that changes in the manufacturing technology of Delco products over the past several years have required changes in how these products are serviced. They claim that they decided to terminate the agreements with Plaintiffs because the agreements no longer made "business sense." Because of rising costs in inventory and repair equipment, increased consumer demands, and extended warranty coverage, "Defendants determined that they must evolve from a system utilizing numerous, and often small, repair centers to a few specialized facilities with complete remanufacturing facilities." (Def.s' Mot. Summ. J. Br. Supp. at 3.) Defendants decided to refer all repair work to authorized service centers only. Plaintiffs agree that the trend has been toward replacement of the entire radio rather than repair of component parts.

---

1. All reference to "evidence" means summary judgment evidence.

This trend is evidenced further by the fact that Ford and Chrysler have also consolidated their repair networks and terminated small repair shops. (Def.s' Mot. Summ. J. Br. Supp. at 4.) As a result of Defendants' decision to terminate Plaintiffs' contracts, there are 19 authorized service centers (there were 28 when Plaintiffs originally filed their suit) nationwide that can perform warranty repairs on Delco electronic parts for vehicle year models 1995 and newer.

Plaintiffs contend that Defendants terminated Plaintiffs' warranty repair work on Delco radios, but told them they could still buy parts and perform non-warranty repairs. Plaintiffs' claim Delco then refused to sell parts directly to Plaintiffs, forcing them to buy parts at higher prices from the 19 remaining shops still authorized to perform warranty repairs. Finally, according to Plaintiffs, Defendants completely prohibited Plaintiffs from buying any replacement parts or obtaining service literature necessary to perform non-warranty work on Delco electronic parts.

Plaintiffs filed this suit on May 18, 1998 alleging several causes of action against Defendants. First, according to Plaintiffs First Amended Complaint, Defendants violated the Clayton Act by "engaging in exclusive dealing contracts with the twenty-eight authorized service centers by cutting off the Plaintiffs in monopolistic fashion." In their response to Defendants' Motion for Summary Judgment, however, this claim was transfigured into a claim that "Defendants have attempted to monopolize the market for service work on Delco products, in violation of § 2 of the Sherman Act . . . ." (Pl.s' Opp'n Def.s' Mot. Summ. J. at 2.) Plaintiffs also claim Defendants violated the Robinson–Patman Act by "engaging in commerce to directly or indirectly discriminate in the price charged for Delco electronic parts." Plaintiffs further assert that Defendants violated Section 1 of the Sherman Act by "engaging in civil conspiracy with each other and the twenty-eight authorized service centers to restrict the sell [sic] of Delco electronic parts and sharply limit the number of shops which could repair and manufacture Delco products." Finally, Plaintiffs allege that Defendants breached "impliedly created" franchise agreements, and violated consumer protection laws in Indiana and California. After over 18 months of discovery, Plaintiffs and Defendants moved for summary judgment.

## II. *Analysis*

Defendants move for summary judgment on Plaintiffs' antitrust and state law contract claims. Plaintiffs move for summary judgment on their state law consumer protection claims. The Court will consider the antitrust law claims first, because dismissal of those claims may obviate the need to consider the state law claims. Defendants first argue that certain plaintiffs' claims are barred by the statute of limitations. On the conspiracy in restraint of trade claim, Defendants assert that Plaintiffs have failed to produce any evidence of an agreement and have failed to identify with specificity the service centers with which Defendants are alleged to have conspired. On the price discrimination claim, Defendants contend that Plaintiffs have produced no evidence to support the conclusion that Defendants charged higher prices to Plaintiffs than to other purchasers. Defendants counter Plaintiffs' attempted monopolization claim by asserting that Plaintiffs have failed to identify evidence on the relevant market, market power, intent to monopolize, or dangerous probability of achieving monopoly power. Finally, Defendants contend that Plaintiffs have produced no evidence to support their claim that they have suffered antitrust injury. The Court begins by discussing the standards by which Plaintiffs' and Defendants' motions will be evaluated.

### A. Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any materi-

al fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party must identify evidence that establishes the absence of any genuine issue of material fact, *id.* at 323, 106 S.Ct. 2548, and the court reviewing a grant of summary judgment must evaluate the facts in the light most favorable to the nonmovant. *See Todd v. AIG Life Ins. Co.,* 47 F.3d 1448, 1451 (5th Cir.1995). Once the moving party has properly supported its motion, the burden shifts to the party opposing summary judgment to demonstrate genuine issues of material fact necessitating a trial, using the evidentiary sources set forth in Rule 56(c). *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The proof must be of such quality that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. 1348. Moreover, summary judgment is appropriate when "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Keeping these standards in mind, the court now turns to the parties' arguments.

## B. Statute of Limitations

■ Defendants first contend that some Plaintiffs' claims are barred by the four-year statute of limitations applicable to the federal antitrust and the state law contract claims. The Court concludes that Plaintiffs have presented evidence sufficient to defeat Defendants' summary judgment motion on this affirmative defense.

Section 4B of the Clayton Act requires that any cause of action for treble damages under the antitrust laws be brought "within four years after the cause of action accrued." 15 U.S.C. § 15b. Because Plaintiffs filed suit on May 18, 1998, they must have suffered some actionable antitrust injury on or after May 18, 1994. Defendants claim that to the extent any cause of action accrued to Plaintiffs, it did so upon termination of the service center agreements. (Def.s' Mot. Summ. J. Br. Supp. at 15.) These terminations, according to Defendants, "were clear and unequivocal at the time they occurred." (*Id.* at 14.) Because most Plaintiffs' agreements were terminated prior to May 18, 1994, Defendants conclude that those Plaintiffs' actions are time barred. The only Plaintiffs terminated within the limitations period and, therefore, unaffected by the limitations defense are James A. Borthem, Charles F. Gashler, A. Kent Newsom, Joseph P. and Inez Dyer. (Def.s' Mot. Summ. J. Br. Supp. at 16.) As to the other fourteen terminations, Plaintiffs counter that the limitations defense must fail because Defendants were engaged in a continuing violations of the antitrust laws and those violations continued within the period of limitations. (Pl.s' Opp'n Def.s' Summ. J. Mot. at 16.) The resolution of this issue, therefore, depends on whether the conduct complained of was a one-time event, as Defendants' suggest, or was ongoing and sustained, as Plaintiffs' suggest.

"Generally, an antitrust cause of action accrues, and the four-year statute of limitations begins to run, when a defendant commits an act that injures a plaintiff's business." *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1051 (5th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983). The Fifth Circuit first recognized the "continuing violations" exception to this general rule in *Poster Exchange, Inc. v. National Screen Serv.*

*Corp.*, 517 F.2d 117, 126 (5th Cir.1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976). In *Poster Exchange,* the court dealt with an alleged conspiracy among the defendants to refrain from selling certain items to the plaintiff. The defendants had stopped supplying the item more than four years before the plaintiff filed its antitrust suit. Concluding that the cause of action accrued when the defendants halted the supply, the district court granted summary judgment for defendants on the grounds that the suit was time barred. Applying *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971), the Fifth Circuit reversed and remanded for a determination whether "there had been a specific act or word of refusal [by defendants to deal with plaintiff] during the limitations period." *Poster Exchange,* 517 F.2d at 129. Later Fifth Circuit opinions have reiterated that the "continuing violation" or "continuing conspiracy" exception "permits a cause of action to accrue whenever the defendant commits an overt act in furtherance of an antitrust conspiracy or, in the absence of an antitrust conspiracy, commits an act that by its very nature is a continuing antitrust violation." *Kaiser Aluminum,* 677 F.2d at 1051. In order for this new cause of action to accrue, however, the acts committed by a defendant within the limitations period must be more than "the abatable but unabated inertial consequences of some pre-limitations action." *Poster Exchange,* 517 F.2d at 128. The question in this case is whether Defendants committed any "overt act" within the limitations period that caused antitrust injury to Plaintiffs.

Plaintiffs allege that "Defendants' conspiracy to monopolize the Delco warranty and non-warranty market or to terminate Plaintiffs as repair shops" serves as the overt act necessary to start the statutory period running again. (Pl.s' Opp'n Def.s' Summ. J. Mot. at 17.) Plaintiffs also allege that Defendants' engaged in price discrimination against Plaintiffs by forcing them to purchase parts at higher prices from the 28 authorized shops and that Defendants "completely cut off the Plaintiffs by barring them from buying Delco parts and service literature." (Pl.s' Opp'n Def.s' Summ. J. Mot. at 18.) Plaintiffs have presented some evidence that Defendants committed an overt act within the limitations period. First, Plaintiffs presented a letter from Defendants to their remaining authorized service centers prohibiting the service centers from "purchasing, reselling, or redistributing replacement parts to Plaintiffs." (Pl.s' Opp'n Def.s' Summ. J. Mot. Exhibit U.) Second, Plaintiffs produced a letter from ACDelco to GM dealers instructing the dealers to refer repair work only to authorized service centers. (Pl.s' Opp'n Def.s' Summ. J. Mot. Exhibit V.) Finally, they produced evidence showing that the remaining authorized service centers were unwilling to provide Plaintiffs with replacement parts out of fear of losing their authorized service status with Defendants. (Pl.s' Opp'n Def.s' Summ. J. Mot. Exhibit W.)

Plaintiffs' allegations that Defendants have attempted to monopolize and agreed to restrain trade in the market for Delco radio repair are classic examples of "continuing violations" of the antitrust laws. *See Zenith Radio,* 401 U.S. at 338, 91 S.Ct. 795 ("In the context of a continuing conspiracy to violate the antitrust laws, ... each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and ... as to those damages, the statute of limitations runs from the commission of the act."); *Poster Exchange,* 517 F.2d at 127 ("[E]ach time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act."); *Hanover Shoe v. United Shoe Mach. Corp.*, 377 F.2d 776, 794–95 (3d Cir.1967) (cause of action renewed each time defendant enforced and renewed monopoly-cre-

ating leases), *aff'd in relevant part*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); *TCA Building Co. v. Northwestern Resources Co.*, 861 F.Supp. 1366, 1378 (S.D.Tex.1994) (concluding concerted refusals to deal in furtherance of unlawful agreement or monopoly were within continuing violations exception). Without judging the merit of these claims as antitrust violations, the Court finds that this is sufficient evidence of overt acts within the limitations period. Defendants' motion for summary judgment on this issue is denied.

### C. Conspiracy Claim

Plaintiffs allege that Defendants violated Section 1 of the Sherman Act by engaging in a civil conspiracy with each other and the 19 authorized service centers to restrict the sale of Delco electronic parts and sharply limit the number of shops that could repair or re-manufacture Delco products. Under Section 1 of the Sherman Antitrust Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Of course, since every contract could be considered a restraint of trade, the Sherman Act actually prohibits only unreasonable restraints of trade. *See National Collegiate Athletic Association v. Board of Regents of University of Oklahoma*, 468 U.S. 85, 98–100, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984).

To prevail under Section 1 of the Sherman Act, Plaintiffs must show that a combination or conspiracy existed between two or more entities. Defendants move for summary judgment on two grounds. First, Defendants contend that, as a matter of law, GM and its subsidiary Delco Electronics cannot conspire with each other. Second, Defendants assert that there is no evidence of any conspiracy between GM and Delco Electronics or between GM or Delco Electronics and any distributor. "To survive a motion for summary judgment ... a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. Plaintiffs have failed to produce such evidence.

■ An entity and its wholly owned subsidiary cannot constitute a "conspiracy" within the meaning of Section 1 of the Sherman Act. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); *Deauville Corp. v. Federated Department Stores, Inc.*, 756 F.2d 1183, 1192 (5th Cir.1985)("[W]holly owned subsidiaries are incapable of conspiring with their parent as a matter of law."). Plaintiffs' allegation that Defendants' GM and Delco conspired with each other is, therefore, contrary to the law of this circuit. Defendants' motion for summary judgment on the issue of civil conspiracy between GM and Delco is granted.

■ Defendants also contend that Plaintiffs have produced no evidence of any conspiracy between GM or Delco and any of the authorized distributors. Plaintiffs respond that they have "made out an antitrust claim under § 1 of the Sherman Act, based on the conspiracy between Defendants and the 28 authorized service centers to restrict the sale of Delco parts and to limit the number of shop which could repair and remanufacture Delco products." (Pl.s' Opp'n Def.s' Mot. Summ. J. at 11.) Putting the cart before the horse, Plaintiffs then go into great detail describing how an agreement between manufacturers and dealers to drive the dealers' competitors out of business is per se illegal. (Pl.s' Opp'n Def.s' Mot. Summ. J. at 11–16.) Although it may be true that *if* an agreement can be shown between Defendants and the remaining authorized service centers, then the agreement would be considered horizontal and, thus, illegal per se. *See Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 212, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) ("Group boycotts, or concerted refusals by traders to deal with

other traders, have long been held to be [illegal per se.]"). *But see Mendelovitz v. Adolph Coors Co.,* 693 F.2d 570, 576 (5th Cir.1982) ("[W]e conclude that the refusals to deal do not fall within any of the per se illegal categories."). But that statement presupposes that the complaining party has shown an agreement.

To prevail under Section 1 of the Sherman Act, Plaintiffs must show that a combination or conspiracy existed between two or more entities. *See Fisher v. City of Berkeley,* 475 U.S. 260, 266, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986); *Muenster Butane, Inc. v. Stewart Co.,* 651 F.2d 292, 295 (5th Cir.1981). As the Supreme Court has stated, "there is the basic distinction between concerted and independent action." *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). "Independent action is not proscribed. A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Id.* In the cases cited by Plaintiffs, the complaining party had shown that the alleged conspirators had actually engaged in concerted activity. *See e.g., Klor's,* 359 U.S. at 210, 79 S.Ct. 705 (defendants did not dispute allegations that manufacturers and distributors had conspired); *United States v. General Motors Corp.,* 384 U.S. 127, 143, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966) ("Neither individual dealers nor the associations acted independently or separately . . . Nor did General Motors confine its activities to the contractual boundaries of its relationships with individual dealers."); *Fashion Originators' Guild of America, Inc. v. Federal Trade Commission,* 312 U.S. 457, 461, 61 S.Ct. 703, 85 L.Ed. 949 (1941) (defendants admitted "that to destroy such competition they have in combination purposely boycotted and decline to sell their products" to certain retailers); *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 468–69, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (plaintiff had adduced some evidence of conspiracy to restrain trade); *NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998) (noting that case before the Court involved vertical, not horizontal, agreement and, therefore, per se rule did not apply); *Six Twenty–Nine Productions v. Rollins Telecasting, Inc.,* 365 F.2d 478, 484–86 (5th Cir.1966) (analyzing *General Motors* and *Klor's* as vertical restraints and not, as later Supreme Court cases have, as horizontal restraints). Plaintiffs have not made a similar showing.

To satisfy the concerted action requirement, Plaintiffs must present "direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *See Monsanto,* 465 U.S. at 768, 104 S.Ct. 1464. The evidence offered by Plaintiffs points to a unilateral decision to terminate Plaintiffs' contracts. The letter from GMSPO to ACDelco indicates that GM placed resale restrictions on ACDelco service centers with respect to Delco parts. (Pl.s' Opp'n Def.s' Mot. Summ. J. Exhibit U.) The letter from ACDelco to the GM dealers simply instructs the dealers to use only authorized service centers for repair of GM and Delco electronic parts. (Pl.s' Opp'n Def.s' Mot. Summ. J. Exhibit V.) Even the memo from Specmo Enterprises, Inc., one of the remaining authorized service centers, to Specmo's distributors indicates that the resale restrictions were implemented by GMSPO and not by an agreement between the service centers and GM or GMSPO. (Pl.s' Opp'n Def.s' Mot. Summ. J. Exhibit W.) Also telling is the fact that at least one Plaintiff acknowledged his belief that GM was taking its action to "save money" and "reduce costs" and not as a result of any agreement between GM and some of the remaining service centers. (Huber Dep. at 46:25–47:13; 93:4–20.) Plaintiffs have simply failed to produce any facts showing a "conscious commitment to a common scheme" on the part of GM and Delco and any of the remaining authorized service centers.

■ Defendants also argue that Plaintiffs have failed to show that "as a result of Defendants' activities, some anticompetitive effect in the relevant market." See Wimer v. Holzapfel, 868 F.Supp. 844, 847 (E.D.Tex.1994) (citation omitted). The cases cited by Plaintiffs, i.e., Klor's and its progeny, involved horizontal arrangements constituting concerted refusals to deal. See Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 734, 108 S.Ct. 1515, 1525, 99 L.Ed.2d 808 (1988). That is not the situation here. There are two types of contracts, combinations, and conspiracies in restraint of trade covered by Section 1 of the Sherman Act: horizontal and vertical. Horizontal combinations are cartels or agreements among competitors that restrain competition among enterprises at the same level of distribution. They are ordinarily illegal per se. See Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 647, 100 S.Ct. 1925, 1927, 64 L.Ed.2d 580 (1980); Muenster Butane, Inc. v. Stewart Company, 651 F.2d 292, 295 (5th Cir.1981). "Vertical restraints are imposed by persons or firms further up the chain of distribution of a specific product (or in rare cases, further down the chain) than the enterprise restrained." Muenster, 651 F.2d at 295. Vertical non-price restraints are tested under the rule of reason, which requires plaintiffs to prove that the restraint had an anticompetitive effect in the relevant market in order to prevail. See Continental T.V., 433 U.S. 36, 58–59, 97 S.Ct. 2549, 53 L.Ed.2d 568. See also, Red Diamond Supply, Inc. v. Liquid Carbonic Corp., 637 F.2d 1001, 1005 (5th Cir.1981) (and cases cited therein).

■ This case presents a prototypical vertical restraint case. Defendant manufacturers GM and Delco refused to sell to Plaintiff distributors. Defendants then imposed resale restrictions on their remaining authorized dealers. As the Fifth Circuit has stated, "conspiracies between a manufacturer and its distributors are only treated as horizontal ... when the source of the conspiracy is a combination of the distributors." H & B Equipment Co., Inc. v. International Harvester Co., 577 F.2d 239, 245–46 (5th Cir.1978). By contrast, "[w]hen the manufacturer is the source, the conspiracy is vertical." Red Diamond, 637 F.2d at 1004 (citing United States v. Arnold Schwinn & Co., 388 U.S. 365, 372, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967)). Plaintiffs have presented no evidence that would bring this case under the horizontal conspiracy rubric. As the Fifth Circuit has emphasized in a similar context, moreover, "it is simply not an antitrust violation for a manufacturer to contract with a new distributor, and as a consequence, to terminate his relationship with a former distributor, even if the effect of the new contract is to seriously damage the former distributor's business." See Burdett Sound, Inc. v. Altec Corp., 515 F.2d 1245, 1249 (5th Cir.1975). An antitrust violation only occurs if the termination produces an "unreasonable restraint of trade." Id. at 1248. Because this is a vertical restraint case, the burden is on Plaintiffs to show some evidence of anti-competitive effects in the relevant market in order to prevail in this summary proceeding. Plaintiffs' have failed to meet their burden. Although they have alleged that consumers have been "inconvenienced," that some might have to pay for shipping costs, and that the decrease in the number of repair shops will result in increased prices, Plaintiffs have offered little or no evidence to support these allegations. Mere allegations are not enough.

■ It is well settled that summary judgment is appropriate in antitrust cases where a plaintiff is unable to produce "significant probative evidence" to support the bare allegations in its complaint. See First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); Matsushita, 475 U.S. at 586–87, 106 S.Ct. 1348; Celotex, 477 U.S. at 322, 106 S.Ct. 2548. Plaintiffs "may not rest upon mere allegations or denials of [their] pleading, but ... must

set forth specific facts showing that there is a genuine issue for trial." *See Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. Because Plaintiffs have not produced evidence of conspiracy or evidence of anti-competitive effects, Defendants' motion is granted on the Section 1 claim.

## D. Price Discrimination Claim

Plaintiffs allege Defendants violated the Robinson–Patman Act ("RPA"), which prohibits sellers from discriminating among purchasers of commodities by price differences or, among purchasers for resale by disparate provision of services. *See* 15 U.S.C. § 2(a). Plaintiffs assert that "Defendants charged higher prices to them than to the 28 favored 'authorized service centers.'" (Pl.s' Opp'n Def.s' Mot. Summ. J. at 9.) They claim particularly that, in this "secondary-line" injury case, the "indirect purchaser" doctrine applies because Plaintiffs were "forced to pay ... higher prices through service centers rather than directly to GM and Delco." *Id.* Plaintiffs' argument is that Defendants' attacked them in two stages. First, Defendants cut off Plaintiffs direct supply of Delco products and forced Plaintiffs to purchase those products from the remaining authorized service centers at inflated prices. This conduct gives rise to the price discrimination claim. Then, Defendants in combination with the remaining service centers, completely cut off Plaintiffs' supply of Delco parts and supplies. This conduct gives rise to the attempted monopolization claim, which will be addressed in the next section.

Defendants argue that Plaintiffs have not met the requirements for a price discrimination claim and that "Plaintiffs argument is nonsensical to the extent that they assert that they have been completely unable to purchase service parts or literature, while simultaneously claiming (without supporting evidence) that Defendants engaged in price discrimination." (Def.s' Reply Supp. Def.s' Mot. Summ. J. at 8.) The Court agrees that Plaintiffs have not created a genuine issue of material fact with respect to this claim.

■ In the simplest terms, price discrimination is charging different buyers different prices for the same item. Plaintiffs allege "secondary line" injury, wherein injury to competition is found at the level of competition between favored and disfavored customers. *See Best Brands Beverage, Inc. v. Falstaff Brewing Corp.,* 842 F.2d 578, 584–585 (2d Cir.1987) (describing the three levels of competition). In order to establish secondary line price discrimination under Section 2(a), Plaintiffs have the burden of establishing four facts: (1) that Defendants' sales were made in interstate commerce; (2) that Defendants discriminated in price as between at least two purchasers; (3) that the product or commodity sold to the competing purchasers was of the same grade and quality; and (4) that the price discrimination had a prohibited effect on competition. *See Texaco, Inc. v. Hasbrouck,* 496 U.S. 543, 556, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990). Defendants assert that Plaintiffs have provided no evidence on these elements.

■ Plaintiffs seek to invoke the "indirect purchaser" doctrine in order to meet their burden. "Generally, the 'indirect purchaser' doctrine provides that if the seller has substantial control over its wholesaler in distributing to retailers, then the retailers may indirectly become the 'purchasers' of the seller within the meaning of Section 2(a)." Julian O. von Kalinowski, *et. al.,* 3 Antitrust Laws & Trade Regulation § 39.01[2] n. 42 (2d ed.1998). The indirect purchaser doctrine was described by the Seventh Circuit in *Purolator Products, Inc. v. F.T.C.,* 352 F.2d 874, 883 (7th Cir.1965), *cert. denied,* 389 U.S. 1045, 88 S.Ct. 758, 19 L.Ed.2d 837 (1968):

> To ensure fair competition among purchasers from the same seller, the Robinson–Patman Act amendments to the Clayton Act forbade sellers to make price discriminations between purchas-

ers except when justified by economies to the seller. If a seller can control the terms upon which a buyer once removed may purchase the seller's product from the seller's immediate buyer, the buyer once removed is for all practical purposes dealing directly with the seller. If the seller controls the sale, he is responsible for the discrimination in the sale price, if there is such discrimination. If the seller cannot in some manner control the sale between his immediate buyer and a buyer once removed, then he has no power by his own action to prevent an injury to competition.

As the Fifth Circuit has stated, "the thrust of this so-called 'indirect purchaser' doctrine is that a manufacturer, by utilizing the subterfuge of a 'dummy' wholesaler or distributor, should not be able to evade the price discrimination provisions in the Robinson–Patman Act." *Hiram Walker, Inc. v. A & S Tropical, Inc.*, 407 F.2d 4, 7 (5th Cir.1969) (quoting *American News Company v. F.T.C.*, 300 F.2d 104, 109–110 (2d Cir.1962)).

■ Although Plaintiffs have engaged in a good discussion of the law on the indirect purchasers doctrine, they have not alleged facts to support the application of that doctrine. The key to the doctrine is control. *See American News*, 300 F.2d at 110. Plaintiffs must show that Defendants GM and Delco controlled the authorized service centers' pricing policies or that the authorized service centers were "dummy wholesalers." *See Pierce v. Commercial Warehouse*, 876 F.2d 86, 88 (11th Cir. 1989), *cert. denied*, 493 U.S. 1045, 110 S.Ct. 841, 107 L.Ed.2d 836 (1990). *Pierce* is instructive on why the indirect purchaser doctrine is inapplicable to this case. In that case, the defendant automobile parts manufacturers sold to various distributors at one price. It sold to the plaintiffs in the case, however, only through these distributors, which resulted in the plaintiffs paying a higher price for the parts than the distributors paid. The plaintiffs were thus injured to the extent they competed with

the distributors themselves. The court concluded that there was no violation because the distributors had complete control over their own resale prices. *Id.* In this case, Plaintiffs have not even alleged that Defendants controlled the price at which the authorized service centers sold their goods or services. The indirect purchaser doctrine is, therefore, inapplicable to Plaintiffs case.

Even assuming that Plaintiffs could fit this case into the indirect purchaser doctrine, however, they have not met the requirements for a price discrimination claim. Regardless whether Plaintiffs claim as indirect or direct purchasers, they must allege and prove that there were two sales at different prices made by the same seller to at least two different purchasers. *See Hiram Walker*, 407 F.2d at 6. "Purchasers," as noted above, does not necessarily mean purchasers buying direct from the seller charged with discrimination, *see id.*, but Plaintiffs are still required to show price discrimination.

Plaintiffs' evidence is notably sparse on this element of their claim. They state that they have shown that Defendants charged higher prices to them than to the 28 favored authorized service centers. This statement, however, is not supported by evidence. Plaintiffs have not provided a comparison of the price they paid to the authorized service centers to the price the service centers paid to Defendants. This, at a minimum, is necessary to show that Defendants discriminated indirectly among purchasers. The one piece of evidence Plaintiffs offer in support of their price discrimination claim does not support their cause. Plaintiffs cite to the deposition testimony of William Bryant as evidence that consumers have to pay more as a result of Defendants' decision to reduce the number of authorized service centers. (Bryant Dep. at 66:1–15.) But this testimony does not support Plaintiffs' contention that the terminated service center owners were paying more for Delco parts than the authorized service centers were paying.

Bryant's testimony merely states that consumers may now have to pay for shipping costs and might be more inconvenienced by having to ship their radios to one of the authorized service centers. As one leading authority has written on this point, "subject to a few limitations, a price refers to what the buyer must pay for the product, or the nominal price, not to the differential costs a seller might incur in providing the good to the buyer." 14 Herbert Hovenkamp, Antitrust Law ¶ 2321, at 58–59 (1999). Plaintiffs have presented no other evidence that they paid more for Delco parts than the authorized service centers paid, and the Court will not assume that fact for them. They, therefore, have not presented sufficient evidence to support their price discrimination claim, even under the indirect purchaser doctrine. Any other reading of the allegations would transform every dealer termination into a price discrimination claim for the terminated dealer. That would be contrary to the purpose of the antitrust laws.

The Court concludes, therefore, that Defendants' motion for summary judgment on the price discrimination claim should be granted because Plaintiffs have not offered any evidence that the indirect purchaser doctrine is applicable and, even if it is applicable, they have not offered sufficient evidence that Defendants discriminated in price between two purchasers.

### E. Monopolization Claim

Plaintiffs allege in their First Amended Complaint that Defendants' engaged "in exclusive dealing contracts with the twenty-eight authorized service centers by cutting off the Plaintiffs in monopolistic fashion, thereby violating the Clayton Act." This appeared to be a claim that Defendants were engaged in an exclusive dealing arrangement, which "is a contract between a manufacturer and a buyer forbidding the buyer from purchasing the contracted good from any other seller, or requiring the buyer to take all of its needs in the contracted good from that manufacturer." 11 Hovenkamp, Antitrust Law ¶ 1800a. In

their response to Defendants' Motion for Summary Judgment, however, Plaintiffs effectively abandon this claim by re-characterizing Defendants' conduct as an attempted monopolization under Section 2 of the Sherman Act. But no matter how Plaintiffs characterize their claim, they have not shown that Defendants have violated the antitrust laws. The Court will address Plaintiffs' claim under Section 2 of the Sherman Act.

 A Section 2 attempt claim requires proof of the relevant product and geographic markets. *See C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1244 (5th Cir.), *cert. denied*, 474 U.S. 1037, 106 S.Ct. 604, 88 L.Ed.2d 583 (1985) ("A prerequisite to success under section 2 on either a completed or attempted monopolization claim is proof of the relevant market."); *Total Benefit Services, Inc. v. Group Insurance Administration, Inc.*, 875 F.Supp. 1228, 1233 (E.D.La.1995) (granting defendant summary judgment because plaintiff had not offered sufficient evidence of the relevant market). This requirement flows from the elements of an attempted monopolization claim. To show attempted monopolization, Plaintiffs "must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports v. McQuillan*, 506 U.S. 447, 455–56, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993); *See also Taylor Publishing Co. v. Jostens*, 216 F.3d 465, 474 (5th Cir.2000). As the Fifth Circuit has described the requirements, "[t]he first element considers the conduct, the second looks to the motivation behind the conduct, and the third looks to the defendant's market power and commensurate 'ability to lessen or destroy competition in that market.'" *Taylor Publishing*, 216 F.3d at 474. "A definition of the market is essential because otherwise there is no context in which to determine whether defendant had the ability to lessen or destroy competition." *Total Benefit*, 875

F.Supp. at 1234 (citing *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).). That the market is important under both Section 1 and Section 2, moreover, is understandable considering that the purpose of the Sherman Act "is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." *Spectrum Sports,* 506 U.S. at 458, 113 S.Ct. at 891–92.

■ Plaintiffs begin by asserting that questions of market definition and market power are heavily fact-specific issues that should be resolved at trial. *See Alcatel USA, Inc. v. DGI Techs.,* 166 F.3d 772, 781 & n. 18 (5th Cir.1999) ("the relevant product market is a fact question to be decided by the jury" and "in determining the relevant market, 'the reality of the marketplace must serve as the lodestar.'") (citations omitted). But that does not make questions of market definition and market power immune from summary adjudication. As with any other issue, market definition is subject to summary judgment if the plaintiffs fail to provide sufficient evidence from which a jury could reasonably determine the relevant market. *See Doctor's Hospital of Jefferson v. Southeast Medical Alliance, Inc.,* 123 F.3d 301, 306 (5th Cir.1997); *T.O. Bell v. Dow Chemical Co.,* 847 F.2d 1179, 1184 (5th Cir.1988); *Bathke v. Casey's General Stores, Inc.,* 64 F.3d 340, 345 (8th Cir.1995) (quoting *Flegel v. Christian Hosp.,* 4 F.3d 682, 689 (8th Cir.1993)). If Plaintiffs' contention is that summary judgment is never appropriate on market definition issues, then they are mistaken.

■ Market power is the ability to control prices or exclude competition. *See Roy B. Taylor Sales, Inc. v. Hollymatic Corp.,* 28 F.3d 1379, 1386 (5th Cir.1994). An assessment of market power requires a definition of the relevant market. *See Seidenstein v. National Medical Enterprises, Inc.,* 769 F.2d 1100, 1106 (5th Cir. 1985) ("Before a defendant's market power can be determined, the relevant market

must be defined."). The market definition must include a characterization of the product itself and characterization of the relevant geographic market in which that product is sold. *See Hollymatic,* 28 F.3d at 1386. Plaintiffs contend that "the relevant market in this case [is] the market for repair work on Delco products." (Pl.s' Opp'n Def.s' Mot. Summ. J. at 5.) Plaintiffs also argue that they have identified the relevant geographic markets as the U.S. market, as well as the sub-markets where each plaintiff does business. (Pl.s' Resp. Def.s' Mot. Dismiss at 7.) Beyond their bare assertions, however, Plaintiffs have failed to offer sufficient evidence on the relevant product or geographic market. The Court is left to wonder why the relevant product market, for instance, is not repair work on all car radios. Under Plaintiffs' contention, every car radio manufacturer would be a monopolist in the market for their own product. But absent strong evidence on the issue, a single brand within a product class is presumptively not a separate market. *See* 2A Areeda & Hovenkamp, Antitrust Law, ¶ 563d., at 270–71; *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 488 (5th Cir.1984) (holding that "absent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market."); *Regency Oldsmobile v. General Motors Corp.,* 723 F.Supp. 250, 267–68 (D.N.J. 1989). Plaintiffs have offered no evidence in the form of affidavits, deposition testimony, expert reports, or otherwise that overcomes this presumption. They argue that there is "no need to introduce statistical evidence of market share." But Plaintiffs miss the point that there is a need to produce some evidence to enable the Court to determine the appropriate market within which to judge Defendants' conduct. After 18 months of discovery, they have not done so.

Even if the Court were to accept Plaintiffs' bare allegation that the relevant market in this case is the repair market for

Delco products, Plaintiffs have failed to prove that Defendants' had or exercised market power. They argue that they have demonstrated Defendants'˙ market power through the so-called "lock-in effect." In order to become an authorized Delco repair shop, Plaintiffs allege, Defendants locked the authorized service centers in by requiring them to purchase certain equipment, stock certain inventory, attend training classes and workshops, and perform a minimum amount of Delco business each month. Plaintiffs cite *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), for the proposition that summary judgment is inappropriate for a locked-in defendant in a Section 2 case. In *Kodak,* defendant Kodak argued that market power could never exist over repair parts in any case where the defendant did not have market power over the earlier-purchased machines needing those parts. The Supreme Court reasoned that "at the time of their original copier purchases, some consumers might not have cost efficient access to pricing information needed to evaluate the total 'life-cycle' cost of the entire copier package, *i.e.,* the price of the copier, likely replacement parts, and product-lifetime pricing." *Id.* at 472–77, 112 S.Ct. 2072. Because Kodak's customers found it prohibitively expensive to replace their equipment with another manufacturer's product, they might have tolerated some level of aftermarket price increase before changing brands. *See id.* at 476, 112 S.Ct. 2072. They might, in other words, be "locked-in" to Kodak machines. The Supreme Court thus decided that the "undetermined 'information costs' and 'switching costs' represented material issues of fact that precluded summary judgment." *Id.*

As the Fifth Circuit has noted, "[t]he Supreme Court's decision in Kodak was a rejection of Kodak's assertion that market power could never exist over repair parts in any case where the defendant did not have market power over earlier-purchased machines needing those parts." *United Farmers Agents Ass'n v. Farmers Insur-*

*ance Exchange,* 89 F.3d 233, 237 (5th Cir. 1996), *cert. denied,* 519 U.S. 1116, 117 S.Ct. 960, 136 L.Ed.2d 846 (1997). The court in *United Farmers* pointed out that, "[c]ritically, the plaintiffs in *Kodak* produced evidence that Kodak was charging above market prices for its service and was engaging in price discrimination in favor of the knowledgeable customers who could most easily obtain information or switch companies." *Id.* The heart of the *Kodak* decision was that, in view of the significant evidence presented by the plaintiff, the Supreme Court was simply not prepared to permit a factual determination on the relevant market to be made at the summary judgment stage. *See Alcatel USA, Inc. v. DGI Technologies, Inc.,* 166 F.3d 772, 782 (5th Cir.1999). The Court has not been presented with such a dilemma.

Plaintiffs have introduced none of the evidence courts have required to satisfy a "lock-in" monopolization claim. *See, e.g., Kodak,* 504 U.S. at 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (evidence defendant had power to control price and exclude competition, that switching costs were high, that consumers would tolerate some level of service-price increases); *Virtual Maintenance, Inc. v. Prime Computer, Inc.,* 11 F.3d 660, 666 (6th Cir.1993), *cert. dismissed,* 512 U.S. 1216, 114 S.Ct. 2700, 129 L.Ed.2d 829 (evidence defendant discriminated on price, defendant did not treat all customers equally, expert testimony on lock-in and switching costs); *Allen–Myland, Inc. v. IBM Corp.,* 33 F.3d 194, 206 & n. 15 (3d Cir.), cert. denied, 513 U.S. 1066, 115 S.Ct. 684, 130 L.Ed.2d 615 (1994) ("We hold only that the determination whether to consider the lock-in argument, to permit further discovery on the issue, and to hear additional evidence are all within the district court's sound discretion. If it does so, the district court should then proceed to determine the percentage of the mainframe market occupied by existing mainframe users who are locked in to that type of computer by prohibitively high switching costs; the greater that percent-

age is, the more power IBM has to maintain supracompetitive prices in the mainframe market."); *Collins v. International Dairy Queen, Inc.*, 939 F.Supp. 875, 883 (M.D.Ga.1996) (plaintiffs in tying arrangement case proved significant costs of investing in franchise).

In contrast to *Kodak* and its progeny, Plaintiffs simply allege that they "have made significant brand-specific investments which will be substantially unrecoverable if they shift to other brands." Plaintiffs have introduced no evidence on the costs of these investments. They have introduced no evidence of price manipulation in the market for Delco parts or service. As already shown, they offer no evidence that Defendants attempted to engage in price discrimination. There has been no evidence concerning information and switching costs. Aside from Plaintiffs' bare allegations, there is no evidence that Plaintiffs or, more importantly, ultimate consumers were "locked-in" to Delco radios and electronics. Because Plaintiffs "may not rest upon mere allegations or denials of [their] pleading," *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505, 91 L.Ed.2d 202, their "lock-in" argument fails as a matter of law.

Plaintiffs also argue that "the fact that Defendants are currently driving Plaintiffs out of business *itself* demonstrates market power." (Pl.s' Opp'n Def.s' Mot. Summ. J. at 7.) The problem with this argument is that it does not work in the context of this case. For the proposition that "[p]roof of actual detrimental effects can obviate the need for the inquiry into market power," Plaintiffs cite *Great Western Directories, Inc. v. Southwestern Bell Tel. Co.*, 63 F.3d 1378, 1384 (5th Cir.1995), *on reh'g, op. withdrawn, in part, modified on other grounds, remanded, reh'g en banc, denied*, 74 F.3d 613 (5th Cir.1996), *cert. dismissed*, 518 U.S. 1048, 117 S.Ct. 26, 135 L.Ed.2d 1120. First, the Fifth Circuit in *Great Western* was addressing the adverse effects on *competition*, not on competitors. *Id.* ("[T]he purpose of the market definition and market power inquiry is to determine whether an arrangement has the potential for genuine adverse affects (sic) on *competition.*"). But more important, in the case cited by the Fifth Circuit to support its statement, the plaintiffs had shown actual adverse effects on competition. *See F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 461, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) ("[W]e conclude that the finding of actual, sustained adverse effects on competition in those areas where IFD dentists predominated, viewed in light of the reality that markets for dental services tend to be relatively localized, is legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis.").

Plaintiffs have presented no evidence of any adverse effects on competition. They allege that consumers, and presumably competition, have been harmed in three ways. First, Defendants have restricted the number of repair shops that consumers have available to them—and may limit that number further. (Pl.s' Opp'n Mot. Summ. J. at 4.) Second, consumers have to pay higher prices because of the lack of competition brought about by the reduction in the number of repair centers. *Id.* Finally, consumers might be inconvenienced because it takes longer to have their electronic parts serviced. *Id.* These allegations, unsupported by evidence, are insufficient to create a fact issue. Also insufficient is Plaintiffs' allegations that *their* businesses have suffered. That, unfortunately for them, is not the concern of the antitrust laws. The antitrust laws were enacted for "the protection of competition not competitors." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)).

On the other elements of their attempted monopolization claim, Plaintiffs are similarly lacking in evidence. There is no

evidence that raises a genuine issue of material fact on Defendants' specific intent to monopolize. Plaintiffs claim they have shown that Defendants specifically intended "to restrict severely the number of repair shops available to consumers so that consumers will pay a higher price due to the lack of competition" by citing language in Defendants' Motion for Summary Judgment wherein Defendants "admit" that terminating Plaintiffs saves GM money and "is a good business move" from Defendants' perspective. (Pl.s' Opp'n Def.s' Mot. Summ. J. at 8.) Defendants' business judgment rationalized terminating or not renewing service center agreements with Plaintiffs because "significant changes" in the manufacturing technology of Delco radios and products necessitated a change in the "method of servicing" those products. Plaintiffs have presented no evidence to refute this justification. In fact, many of Plaintiffs agreed that it was a good business move. (Def.s' Mot. Summ. J. Brief. Supp. at 5–6.) The Court is hopeful that making good business decisions is not, standing alone, a violation of the law.

Finally, Plaintiffs assert that they have shown a dangerous probability that Defendants will achieve monopoly power. To determine whether there is a dangerous probability of monopolization, it is "necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports*, 506 U.S. at 455–56, 113 S.Ct. 884, 122 L.Ed.2d 247. Thus, in an attempt case, "demonstrating the dangerous probability of monopolization ... requires inquiry into the relevant product and geographic market and the defendant's economic power in that market." *Id.* at 456, 506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247. As discussed above, Plaintiffs have failed to produce evidence of Defendants' market power.

Plaintiffs thus have failed to produce any evidence that would support their allegation that Defendants' have attempted to monopolize the market for repair work on Delco products. Defendants' motion, therefore, is granted on the attempted monopolization claim.

### F. Antitrust Injury

Defendants assert that Plaintiffs have not suffered antitrust injury because their "alleged injuries do not result from a decrease in competition, but from the termination of their respective buying arrangements with General Motors and its independent service dealers." (Def.s' Mot. Summ. J. Br. Supp. at 24.) In view of the Court's prior findings, however, it is unnecessary to decide this case on this issue.

"Antitrust injury must be established for the plaintiff to have standing under section 1 or section 2 of the Sherman Act." *Doctor's Hospital*, 123 F.3d at 305–06. Showing that the plaintiff's injury "flows from that which makes defendants' acts unlawful" does this. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 113, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations ... would be likely to cause.'" *Brunswick Corp.*, 429 U.S. at 489, 97 S.Ct. 690, 50 L.Ed.2d 701.

Contrary to Defendants' assertions, however, the "antitrust laws ... do not require a plaintiff to establish a market-wide injury to competition as an element of standing." *Doctor's Hospital*, 123 F.3d at 305. Moreover, a court need not even consider antitrust injury when it has already concluded that the plaintiff's claims are without merit. As the leading authorities on antitrust have concluded:

> When a court concludes that no violation has occurred, it has no occasion to consider standing ... An increasing number of courts, unfortunately, deny standing when they really mean that no violation has occurred. In particular, the antitrust injury element of standing demands that the plaintiff's alleged inju-

ry result from the threat to competition that underlies the alleged violation. A court seeing no threat to competition in a rule-of-reason case may then deny that the plaintiff has suffered antitrust injury and dismiss the suit for lack of standing. Such a ruling would be erroneous, for the absence of any threat to competition means that no violation has occurred and that even suit by the government—which enjoys automatic standing—must be dismissed.

*Levine v. Central Fla. Med. Affiliates, Inc.,* 72 F.3d 1538, 1545 (11th Cir.), *cert. denied,* 519 U.S. 820, 117 S.Ct. 75, 136 L.Ed.2d 34 (1996) (quoting Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 360f, at 202–03 (rev.ed.1995)).

The standing requirement, as the Fifth Circuit has opined, should not become the "tail wagging the dog" whereby an antitrust case is dismissed based on standing when it should have been dismissed on the merits. *See Doctor's Hospital,* 123 F.3d at 305. Plaintiffs allege that consumers, and presumably competition, have been harmed because (a) Defendants have restricted the number of repair shops that consumers have available to them—and may limit that number further; (b) consumers have to pay higher prices because of the lack of competition brought about by the reduction in the number of repair centers; and (c) consumers might be inconvenienced because it takes longer to have their electronic parts serviced. The problem is that these allegations lack merit as antitrust violations.

Because the Court has analyzed Plaintiffs' conspiracy claim, price discrimination claim, and attempted monopolization claim and concluded that no violation has occurred, the "better path is to grant summary judgment on the merits." *Id.* Defendants' motion for summary judgment on antitrust injury is denied.

## G. State Law Claims

Defendants move for summary judgment on Plaintiffs' Texas law contract claim. Plaintiffs' move for summary judg-

ment on their California and Indiana consumer protection law claims. *See* Cal. Civil Code § 1790, *et. seq.;* Ind.Code Ann. § 26–2–6–1, *et. seq.* Because the Court's jurisdiction was based on the federal antitrust claims that have now been dismissed, in accordance with this circuit's general rule, *see, e.g., Parker & Parsley Petroleum v. Dresser Indus.,* 972 F.2d 580, 585 (5th Cir.1992) ("Our general rule is to dismiss state claims when the federal claims to which they are pendent are dismissed."), the Court dismisses the remaining state law claims. Although this general rule is supplemented by considerations of "political economy, convenience, fairness, and comity," the balance of factors in this case "point toward declining to exercise jurisdiction over the remaining state-law claims." *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 & n. 7, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988). First, any discovery and research already completed by the parties in preparation for trial can still be used in future state court proceedings. Second, dismissal will further the interests of federalism by assuring that this Court does not unnecessarily decide issues of state law. This Court, therefore, orders the state law claims dismissed without prejudice.

## III. *Conclusion*

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's antitrust claims and DENIED as to Plaintiff's state law contract claim. Plaintiffs' motion on their state law consumer protection claims is DENIED. The state law claims are dismissed without prejudice.